UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PATRICIA BLACK, ASHLEY PLATT, and
SHAWN DANIELSON,
    *Plaintiffs*,

v.

NEW ENGLAND COMPUTER SERVICES,
INC. and CHRIS ANATRA,
    *Defendants*.

No. 3:18-cv-2101 (JAM)

**ORDER ON POST-TRIAL MOTIONS**

    Plaintiffs Patricia Black, Ashley Platt, and Shawn Danielson worked at New England Computer Services, Inc., a software company. They filed a lawsuit against the company and its president, Chris Anatra, primarily claiming that they had suffered sex discrimination. After a trial, a jury agreed with many of their claims and awarded the women over $200,000 in damages.

    The parties have now filed three post-trial motions. The defendants move to reduce the jury's damages. The plaintiffs move for additional remedies. And the plaintiffs seek an award of attorneys' fees and costs. I will grant each of the motions in part.

**BACKGROUND**

    The plaintiffs sued NECS and Anatra for sex discrimination, retaliation, and defamation. They claimed that the defendants had discriminated against them by underpaying them compared to a male employee named Chris Londa. They alleged that this violated the Connecticut Fair Employment Practices Act, the federal and Connecticut Equal Pay Acts, and Title VII of the Civil Rights Act of 1964.[1] In addition, Danielson claimed that when she complained about this discrimination, the defendants fired her in response. She therefore brought retaliation claims

---

[1] Doc. #17 at 19–20.

under Title VII, the federal Equal Pay Act, and the Connecticut Fair Employment Practices Act.[2] Finally, all three plaintiffs claimed that the defendants had defamed them.[3]

After a trial, the jury returned a mixed verdict. The plaintiffs won their federal and state Equal Pay Act claims, and Danielson won her retaliation claims. But the plaintiffs lost their Title VII and Fair Employment Practices Act discrimination claims, as well as their defamation claims. The jury awarded $11,192.90 to Black, $19,051.98 to Platt, and $11,090.20 to Danielson in economic damages for the equal pay violations. For Danielson's retaliation claim, it awarded her $55,320.02 in economic damages, $62,000 in noneconomic damages, and $75,000 in punitive damages.[4]

The parties have now filed post-trial motions. The defendants seek an order of remittitur, arguing that some of the damages were not supported by the trial evidence.[5] The plaintiffs seek liquidated damages, pre- and postjudgment interest, attorneys' fees, and either reinstatement of Danielson's job or front pay.[6]

## DISCUSSION

### *Motion for remittitur*

The defendants have moved for an order of remittitur. "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015).[7] Remittitur is appropriate if a "court can identify an error that caused the jury to include in the verdict a

---

[2] *Id.* at 22–23.
[3] *Id.* at 21.
[4] Doc. #132 at 4–6.
[5] Doc. #138.
[6] Docs. #139–40.
[7] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

quantifiable amount that should be stricken"—for example, if there was not enough evidence in the trial record to support the jury's full award of damages. *Ibid*.

The defendants argue that all three women's damages were excessive. I agree that Platt's damages were slightly too high, but I will otherwise deny the motion.

*A. Platt*

The jury awarded Platt $19,051.98 in compensatory damages under the federal and state Equal Pay Acts. But that figure is slightly higher than what the trial evidence supports.

Under the federal Equal Pay Act, an employer may not "pay[ ] wages to [female] employees … at a rate less than the rate at which [it] pays wages to [male] employees … for equal work." 29 U.S.C. § 206(d)(1). The Act then defines "any amounts owing to any employee" under this rule as "unpaid minimum wages or unpaid overtime compensation." § 206(d)(3). And it gives employees a cause of action to recover "their unpaid minimum wages, or their unpaid overtime compensation." § 216(b). The Connecticut Equal Pay Act is similar: if an employer pays a woman less than a man for the same work, it lets the woman recover "the difference between the amount of wages paid and the maximum wage paid any other employee for equal work." Conn. Gen. Stat. §§ 31-75(a), 76(b).

Under either Act, Platt's damages were a bit too high. Londa started his job on March 1, 2017. From then until November 12, the defendants paid him $44,327.80 and Platt $27,260.[8] By finding an equal pay violation, the jury evidently thought that Londa and Platt did "equal work." So under either Act, Platt was entitled to the difference between her and Londa's salaries: $17,067.80. On this point, the parties agree.

---

[8] Pl. Exh. 43 at 1–2 (¶¶ 6, 8–9). At times, the parties quote differing salary figures in their briefs, because one side rounded the weekly salaries and one did not. I will rely on the rounded numbers because the parties stipulated to those figures at trial. *Ibid*.

But they disagree over whether Platt accrued any damages after that. After November 12, Platt was on maternity leave. Yet the defendants kept paying her a salary for four more weeks. These payments were a bonus, because the trial record does not establish that Black was entitled to any paid maternal leave.[9] The bonus payments ended in December. That same month, the defendants also paid Platt a year-end bonus equal to one week of her salary. At trial, Anatra testified that most employees received a similar bonus, and that Londa likely did in 2017.

Platt then went a few weeks without pay. But on January 1, she unlocked more paid vacation and personal days.[10] She used these days immediately and thus received 2.4 weeks of salary while she continued her maternity leave.[11] After that, she again stopped receiving her salary, and soon she quit.

At trial, Platt argued that she accrued damages during her maternity leave: the difference between the 7.4 weeks of salary she earned during those months and 7.4 weeks of Londa's salary. The defendants reply that Platt does not deserve damages for this period because she was not doing "equal work." I agree with them in part. Because Platt did not work for the company during her maternity leave, she did not do equal work to Londa and thus was not entitled to the same pay as him. In fact, because there is no evidence that the defendants gave Londa a similar benefit, she was not entitled to *any* maternity pay. The defendants' choice to give some maternity leave payments to Platt did not commit it to paying her a full salary. Therefore, Platt is not entitled to damages based on her four weeks of maternity leave payments.

But she may recover damages based on her year-end bonus and the vacation pay she earned in January. True, she was not working when she received that pay. But Londa did not do

---

[9] Pl. Exh. 2 at 13.
[10] *Id.* at 18–19.
[11] Pl. Exh. 37 at 2.

extra work for his year-end bonus either. And because Platt was entitled to annual vacation pay under company policy, a jury could have found that this pay was compensation for her previous work.[12] Londa earned his bonus and vacation pay—for his equal work—at his normal, higher salary.[13] Thus, the jury could have reasonably awarded Platt the difference between her vacation pay and bonus, and 3.4 weeks of Londa's salary: $1,587.80.

Adding that to the $17,067.80 that the parties agree on, the evidence supported a verdict of $18,655.60. The jury, however, awarded Platt $19,051.98, and she has not pointed to any other evidence that could support this greater figure. Therefore, Platt's damages should be reduced by remittitur to $18,655.60.

*B. Black*

The jury awarded Black $11,192.90 in Equal Pay Act damages. But during the months she worked with Londa, he outearned her by the smaller sum of $7,191.80.[14] Still, Black argues, the larger damages figure is proper because she also lost out on valuable benefits. In particular, the defendants offered Londa full health insurance for his family but did not make her the same offer (she received only a smaller reimbursement).[15]

Black is correct that the Equal Pay Act covers unequal benefits, not just unequal salaries. *See Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 518 (S.D.N.Y. 2018); 29 C.F.R. § 1620.10. But there is a catch: at trial, Londa testified without contradiction that he did not *take* the insurance benefit that he was offered. And the defendants

---

[12] Pl. Exh. 2 at 18–19.
[13] *Ibid*.
[14] Doc. #138-1 at 12; Doc. #144 at 7.
[15] Pl. Exh. 9.

argue that the jury was not allowed "to consider the value of any hypothetical benefits that Londa may have been offered but did not actually receive."[16]

I do not agree. Under the EEOC regulations implementing the Equal Pay Act, "[i]t is unlawful for an employer to *make available* benefits for the spouses or families of employees of one gender where the same benefits are not *made available* for the spouses or families of opposite gender employees." 29 C.F.R. § 1620.11(d) (emphasis added). Under this regulation, any benefits that the defendants "made available" to Londa's family would count as Black's "unpaid minimum wages" and add to her damages, whether or not Londa accepted the benefits. 29 U.S.C. § 206(d)(3).

To be sure, I may not follow the EEOC's interpretation if the Act unambiguously forecloses it. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). Here, however, the agency's rule is a reasonable interpretation of an otherwise ambiguous statute. The Act does not require an employer to pay men and women the same *dollar figure*; it says that the employer must pay women at the same "rate at which he pays [men]." This phrase can be reasonably understood to cover the rate that someone is currently *offering* to pay men, even if the offer has not yet been accepted. For example, if a gas station changed its price to $4.00 per gallon this morning, but has not yet made a sale today, the station's owner could still say that "$4.00 is the rate at which he sells gasoline."

Second Circuit precedent confirms that an employer can have a certain "rate at which" it pays men even if it does not currently pay any man that rate. In *Lavin-McEleney v. Marist College*, 239 F.3d 476, 482 (2d Cir. 2001), the court held that a woman could measure her Equal Pay Act damages as the difference between her salary and a statistical estimate of what she

---
[16] Doc. #138-1 at 11.

would have earned if she had been a man. Although the court required the woman to identify at least one male comparator, the court did not require her to compare her salary to that of any specific man. If a jury may infer the "rate at which" an employer "pays" someone by using a statistical model, it can at least as reasonably infer that rate from an unaccepted offer.

Moreover, the defendants' reading of the Act would have consequences that the EEOC could have reasonably thought implausible. Say that an employer offers triple overtime pay to its male workers but only double overtime pay to its female workers. Under the defendants' reasoning, the female workers could work thousands of overtime hours, but would have no remedy under the Equal Pay Act if it happened that no man chose to work overtime. Yet once a single man worked a single hour of overtime, they could recover for all the hours. The EEOC could sensibly reject this strange result and instead reason that an employer violates and is accountable under the Act simply by making unequal offers of employment benefits.

Because unequal offers violate the Act, the jury could have considered the health benefits when deciding Black's damages. At trial, Black alleged that she had to pay $4,172.97 for her family's insurance because the defendants did not fully cover it. The jury could have reasonably credited this sum as the value of the benefits that Black was wrongly denied. And this figure plus her lost wages is greater than the jury's award. The evidence therefore supports the jury's verdict, and there is no basis for a remittitur.

*C. Danielson*

The jury found that the defendants retaliated against Danielson in violation of the federal Equal Pay Act, the Connecticut Fair Employment Practices Act, and Title VII. It then awarded her $75,000 in punitive damages. The defendants argue that none of these laws can support the damages. I do not agree. At a minimum, the damages were proper under the Equal Pay Act. The

defendants argue that the Act categorically bars punitive damages for retaliation claims. Yet I read the statute differently.

To be sure, the Act does not expressly authorize punitive damages. But when Congress creates a cause of action, courts must "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 66 (1992). And "punitive damages [are part of] the full spectrum of remedies generally available for violation of a federal statute." *DeLeo v. City of Stamford*, 919 F. Supp. 70, 74 (D. Conn. 1995). Thus, I must presume that punitive damages are available under the Equal Pay Act.

The Act says nothing to rebut this presumption. Instead, it echoes *Franklin* in letting courts award "such legal or equitable relief as may be appropriate to effectuate the purposes of [the Act]." 29 U.S.C. § 216(b). Punitive damages are a form of legal relief. *See Tull v. United States*, 481 U.S. 412, 422 (1987). I therefore agree with those other courts that hold that a plaintiff may recover punitive damages for retaliation under the Equal Pay Act. *See, e.g., Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108, 111–12 (7th Cir. 1991); *Hanson v. McBride*, 2020 WL 419334, at *1–2 (M.D. Tenn. 2020); *Greathouse v. JHS Sec. Inc.*, 2016 WL 4523855, at *4 (S.D.N.Y. 2016).

True, the Eleventh Circuit has held the opposite. *See Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 933 (11th Cir. 2000). *Snapp* relied mainly on a part of the Act which states that "employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages" are available remedies for retaliation, "*without limitation*." § 216(b) (emphasis added). Because all the remedies it lists are compensatory, *Snapp* reasoned, the "evident purpose" of the Act's retaliation provision was to compensate and not punish. 208 F.3d at 933–34.

8

I am not persuaded. If Congress wanted to bar punitive damages, it could have easily said so. *See, e.g.*, 28 U.S.C. § 2674 (barring punitive damages for tort claims against the government). Instead, Congress described the available remedies capaciously—"appropriate" "legal or equitable relief"—and explicitly wrote that its example remedies were "without limitation." All the examples' being compensatory is not a clear enough signal to override the strong presumption that a traditional remedy like punitive damages is available.

The defendants also argue that the plaintiffs may not recover punitive damages because they did not ask for them in their complaint. But under Federal Rule of Civil Procedure 54(c), a final nondefault "judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). Thus, even though Danielson did not originally ask for punitive damages, the jury was allowed to award them.

Aside from the defendants' argument that punitive damages are categorically unavailable, they do not challenge the amount of the damages. I will therefore deny their motion to reduce the damages to zero.

*Motion for additional remedies*

The plaintiffs argue that their verdicts entitle them to additional remedies. I largely agree.

First, the plaintiffs seek liquidated damages. Under the Equal Pay Act, plaintiffs who recover backpay for unequal wages can get "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Although there is an exception for employers who acted in good faith, the defendants do not argue that the exception applies. I therefore award Black $11,192.90, Danielson $11,090.20, and Platt (if she accepts the remittitur) $18,655.60 in additional liquidated damages.

9

Next, the plaintiffs seek prejudgment interest. When "required wages have been wrongfully withheld from [an] employee, the employee is normally entitled not only to the amount that has been withheld but also to compensation for the delay in receiving those wages." *EEOC v. Erie Cty.*, 751 F.2d 79, 82 (2d Cir. 1984). Thus, "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award." *Clarke v. Frank*, 960 F.2d 1146, 1154 (2d Cir. 1992).

The jury awarded Danielson $55,320.02 in economic damages for the retaliation claims. While the defendants argue that prejudgment interest is not warranted under Connecticut law, they do not argue that it would be improper under Title VII. I will therefore award Danielson prejudgment interest on her Title VII retaliation claim.

Most courts in the Second Circuit calculate prejudgment interest by applying the rate provided for postjudgment interest in 28 U.S.C. § 1961, the Federal Reserve's weekly average one-year constant maturity Treasury yield. *See Gaul v. City of New Haven*, 2016 WL 6780290, at *2 (D. Conn. 2016). I will use that rate here as a reasonable estimate of the harm that Danielson suffered because of the delay in receiving her salary. Because this rate simply reflects the time value of money, it does not penalize the defendants for any delays in the case due to COVID-19. Applying this rate, I will award Danielson interest of $1,429.04.[17]

But I will not award the plaintiffs prejudgment interest on their Equal Pay Act claims. "A basic principle of compensatory damages is that an injury can be compensated only once." *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996). And "[a]mong other purposes, liquidated damages compensate for the delay in receiving wages that should have been paid."

---

[17] To calculate this figure, I divided the $55,320.02 evenly over the 148 weeks between when Danielson was fired and when the jury returned a verdict. I then calculated the interest due on each weekly payment using the previous week's Fed rate, compounding annually. *See* 28 U.S.C. § 1961.

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988). Thus, "[i]t is well settled that in an action for violations of the Fair Labor Standards Act [which contains the Equal Pay Act,] prejudgment interest may not be awarded in addition to liquidated damages." *Ibid*. Because the plaintiffs will receive liquidated damages, prejudgment interest would double-compensate them.

The plaintiffs also seek postjudgment interest. They are entitled to this interest under § 1961, and the defendants do not oppose this request. But as the plaintiffs concede, the interest is minimal. Under the formula in § 1961, the defendants owe $3.94 in postjudgment interest to Black, $6.39 to Platt, and $73.56 to Danielson.

Finally, Danielson asks me to order the defendants to reinstate her to her technical support job, or else award her front pay. When a plaintiff suffers discrimination in violation of Title VII, "the [court's] responsibility … is to fashion equitable relief to make the claimant whole." *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006). And here, Danielson would not be whole without an additional remedy. Before she was fired, she testified, she worked for the defendants for 15 years and "loved" her job.[18] Although she has since found a new job, it pays her less, is less enjoyable, and is not in her field.[19] Therefore, Danielson will continue to endure the harms of her wrongful firing unless she receives a forward-looking remedy.

Although she would accept front pay, I will award her reinstatement. "When a person loses h[er] job, it is at best disingenuous to say that money damages can suffice to make that person whole." *Ibid*. Thus, when a plaintiff was wrongly fired, reinstating her is the "overarching preference." *Ibid.*; *see also* 42 U.S.C. § 2000e-5(g)(1) (authorizing reinstatement in Title VII cases). Here, reinstatement is proper. Danielson has testified that "[she]'d love [her] old position

---

[18] Pl. Exh. 43 at 1 (¶ 3).
[19] Pl. Exh. 40.

back" and "would take it" if offered. The defendants disagree and argue that her relationship with the company has frayed too much for her to return. But during the hearing on this motion, they offered no evidence that they were unwilling to rehire her. I therefore credit Danielson's testimony that she could return to work.

The defendants also argue that if Danielson had looked harder, she could have mitigated her damages and found a different, acceptable computer job. But the evidence shows otherwise. According to Danielson's records, she applied unsuccessfully to over 50 jobs after she was fired, including computer jobs like "computer operator," "computer support staff," "tech support specialist," "help desk tech," and "IT support specialist."[20] And even "to this day," she testified, she is still "regularly looking [for computer jobs]," but has never been offered one. I credit this testimony and find that Danielson has spent many hours searching in good faith for a computer job. Because those efforts have failed, I will order the defendants to reinstate her.

### *Petition for attorneys' fees and costs*

Finally, the plaintiffs have petitioned for $287,712.50 in attorneys' fees and $8,470.16 in costs. The defendants concede that they are liable for some of the fees and costs. *See* 42 U.S.C. § 2000e-5; 29 U.S.C. § 216. But they argue that they should owe less. I agree with them in part.

Start with fees. It is well established that courts evaluating a request for attorneys' fees must conduct a "lodestar analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014). The resulting amount "is only presumptively reasonable; it is still within the court's discretion to adjust the amount upward or downward based on the case-specific factors." *Tyco Healthcare Grp. LP v. Ethicon Endo-*

---

[20] Pl. Ex. 34.

*Surgery, Inc.*, 2012 WL 4092515, at *1 (D. Conn. 2012). "Hence, the process is really a four-step one, as the court must: (1) determine the reasonable hourly rate; (2) determine the number of hours reasonably expended; (3) multiply the two to calculate the presumptively reasonable fee; and (4) make any appropriate adjustments to arrive at the final fee award." *Bruce Kirby, Inc. v. Laserperformance (Eur.) Ltd.*, 2021 WL 328632, at *18 (D. Conn. 2021).

At the first step, I find that the plaintiffs' request is based on reasonable hourly rates. Their lead attorney Deborah McKenna, who has twenty-five years of experience, charged $400 to $450/hr. Michael Petela, a lawyer with eleven years of experience, charged $350/hr. Thomas Durkin, a junior associate, charged $250/hr. And some paralegals charged $100–$150/hr. The defendants do not challenge Durkin's rate, and the other rates are in line with rates that courts in this District have approved for paralegals and lawyers of similar experience. *See Hughes v. Hartford Life & Accident Ins. Co.*, 2020 WL 563364, at *3 (D. Conn. 2020) (awarding $425/hr. to senior ERISA lawyers); Doc. #19 at 11 in *Belgada v. Hy's Livery Service, Inc.*, 19-cv-550 (D. Conn.) (awarding McKenna $500/hr.); *Dubois v. Maritimo Offshore Pty Ltd.*, 422 F. Supp. 3d 545, 563 (D. Conn. 2019) (awarding $350/hr. to a lawyer with fourteen years of experience); *Bruce Kirby, Inc. v. LaserPerformance (Eur.) Ltd.*, 2020 WL 502653, at *5 (D. Conn. 2020) (awarding $150/hr. for paralegal work). I therefore approve the lawyers' rates.

I also find that the lawyers billed a reasonable number of hours. Hours are reasonable if "at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). To support their request for fees, the plaintiffs have provided the Court with contemporaneous billing records indicating the dates, hours expended, and nature of the work completed by each attorney and staff member.[21]

---

[21] Doc. #139-2.

Based on my own review of these records and the defendants' failure to object to any particular entry, I conclude that the hours expended are reasonable.

Because I credit both the plaintiffs' proposed rates and their proposed hours, I also credit their lodestar calculation of $287,712.50 in attorneys' fees. But I must consider whether to adjust that figure. I conclude that it must be slightly lowered because the plaintiffs did not win a complete victory.

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). If a lawyer "achieved only partial … success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley v. Eckerhart*, 461 U.S. 424, 436, 440 (1983). Here, although the plaintiffs won a significant verdict on their discrimination and retaliation claims, they lost their defamation claims. Because the defendants should not have to pay for the plaintiffs' losing efforts on those claims, I will reduce the plaintiffs' fees.

By how much? The plaintiffs argue that I should simply exclude the billing entries that related only to the defamation claims. In fact, their lodestar calculation already omits those hours. But in my view, that does not go far enough. The lawyers billed for many general entries that partially involved work on the defamation claims, like the trial days.[22] So the hours must be reduced further.

The defendants propose reducing the hours by one third, since one of the three sets of claims lost. But this goes too far in the other direction. Many of the lawyers' efforts—for example, the time they spent picking a jury—did not scale with the number of claims. Thus, reducing the hours by one third would understate how much time the plaintiffs' lawyers needed

---

[22] *See, e.g., id.* at 42–43.

to spend on the winning claims.

In all, I conclude that the legal fees should be lowered by 15% to account for the unsuccessful defamation claims. I therefore award the lawyers $244,555.63 in fees. I will also award them the $8,470.16 they request in costs. The defendants object to only one cost: $917 that the plaintiffs spent to videotape Anatra's deposition. But for the reasons stated by the plaintiffs—especially the importance of his testimony to the case—I find that this expense was reasonable.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the motion for remittitur (Doc. #138). Platt shall file a statement by March 23, 2022 saying whether she accepts the Court's remittitur of her damages to $18,655.60 or whether she wishes the Court to grant a new trial on these damages instead. The Court GRANTS IN PART and DENIES IN PART the motion for additional remedies (Doc. #140). The Court awards Black $11,192.90 in liquidated damages and $3.94 in postjudgment interest. If Platt accepts the remittitur, the Court awards her $18,655.60 in liquidated damages and $6.39 in postjudgment interest. The Court awards Danielson $11,090.20 in liquidated damages, $1,429.04 in prejudgment interest, and $73.56 in postjudgment interest. The Court also orders the defendants to offer to reinstate Danielson by March 30, 2022 to her former job, at a salary consistent with the Equal Pay Act. Finally, the Court GRANTS IN PART and DENIES IN PART the plaintiffs' petition for attorneys' fees and costs (Doc. #139) and awards them $244,555.63 in fees and $8,470.16 in costs.

It is so ordered. Dated at New Haven this 9th day of March 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge